Take your time if you need to arrange your papers or whatever You know, I'm Robert Davis and I represent in this case Jeff McAndrews and this appeal of the issue of qualified immunity. This is, I think, a very interesting case and I think the court below, Judge Payne, has done an excellent job of setting out the exact facts that we need to look at to make this determination. On page 25 of his memorandum opinion, he states that relying on the statement of Lorraine McAfee and the location of the taser after the shooting, those two factors, Mr. McAfee did not pose a threat of serious physical harm to anyone at the time that he was shot under that position. And then he goes on to recite that there is another position in the case. We disagree fundamentally with what the court found. The court submitted a rule 807 of the Federal Rules of Evidence, which case law has basically stated is a rare incident when something like that should actually occur under that exception. That exception was actually amended in 2019 and I think the amendment is is really interesting because it provides kind of a different standard and a different approach to analyzing rule 807 admissions into evidence. Kind of the appropriate process in a situation like this where you have a qualified immunity appeal and you also have an appeal of a piece of evidence is that you first take a look at the evidentiary issue and then after you solve the evidentiary issue and determine what the actual record would be on appeal, then you make a determination as to the qualified immunity appeal. And I think that's a really interesting way to look at rule 807 in discussing what actually the court can and should consider. The rules now specifically state after the 2019 amendment that the statement has to be supported by sufficient guarantees of trustworthiness after considering the evidence. As I understand it, that goes to the ultimate admissibility of the evidence. Is that right? Yes, Your Honor. But under Rule 56, as it was amended in 2010, the courts can consider evidence even though it's not presently admissible if it is evidence that ultimately could be admissible. My point is that the admissibility under 807, it seems to me, is not an issue here since the standards under the revised Rule 56 have been relaxed for about the last 12 years. Your Honor, I think that really is an excellent point and this is how I think that lends itself to our argument. It's like with an affidavit, Your Honor, under federal rule of Civil Procedure 56C. An affidavit, even though it's sworn to, Your Honor, is not admissible if the person, if the affiant, is dead because the affiant can never go into court and prove that up. We have the identical situation here except that it's an unsworn statement. So is it your position that Rule 56 would apply to things that could become admissible if you could, if it's just that, oh, it's a business records affidavit or something and you didn't get it up and it's possible. But Rule 56 can't be a shield for things that could never be admitted at the court. Exactly, Your Honor, and I think that's the major distinction in this case. If it's possible down the road to prove up a business record, then that's one thing and that can be overlooked by the court. But it's your position this could never come into evidence. This could never come into evidence, Your Honor. I totally agree with that, with that point. And in this particular case, Your Honor, in looking at Rule 807, in addition to it never being able to come in to evidence because the affiant is no longer alive and because of the various factors that relate to it, let's say even if it could, it's not proper under Rule 807 when you do the balancing test and when you look at the various factors and the evidence surrounding it. Do we have any jurisdictional problems with going into whether the 807 analysis was incorrect? Do we have jurisdiction over that claim? Yes, Your Honor, so, to me, that's a very good question, and I think that's what the court has to do, what the court does, and I base that essentially, Your Honor, on some predecessor cases out of the Fifth Circuit which essentially did the same thing and found that first the court has to make a determination as to the evidentiary issue, and then the court has to determine whatever the record ends up being, whether or not the record would substantiate the person being entitled to qualified immunity. That's the, essentially, Your Honor, that's what I believe the cases have held. So we really don't have a jurisdictional issue as such. If we did, then the courts could escape ruling on qualified immunity constantly by making the same type of arguments, and qualified immunity is so incredibly important, especially to these officers, and as the Supreme Court and the Fifth Circuit have repeatedly held, it needs to be decided early, and it needs to be decided in a manner that shields the officers from suit and from There's no other support for that statement. That's one of the reasons, and then you were just elaborating on that under the new amendments, that you need other support for it, and there's no other support, and also the determination that the Texas Rangers provided the support is not accurate because that's not the statement by the, they're not similarly situated. Texas Rangers were actually investigating the officers. They're adverse to some degree. Exactly, Your Honor, and I was really surprised. I was taken aback by that because the court actually made two comments. The court said, first of all, the Texas Rangers are aligned with Harrison County, when actually the Texas Rangers are there to investigate Harrison County and Harrison County's officers, as they do across the state in similar situations such as this, and the court made that statement with absolutely no evidence to support it. Is there any physical evidence, as an officer of the court, that would support, I'm asking you, is there any physical evidence that supports that he was lying down? I know you say there's evidence that the shots in the wall say that he was not lying down, and it was actually up, and that the physical evidence supports you. Is there any physical evidence that would support the plaintiff's theory? Not at all, Your Honor. If he was actually fired upon while he's lying down, the bullet would have gone through him. It would have lodged in the floor, at least ricocheted off the floor. In this case, the bullet would have had to ricochet off the floor, flown backwards, and hit the wall. So there's no physical evidence in any manner that supports their version of events, or what they say is a version of events. Would you argue that the Scott v. Harris would support us granting summary judgment, whereas here there's gaps in what we can see, and that sort of thing? Is that, you don't, you're not contending that independently, Scott v. Harris would allow us just to grant qualified immunity here, are you, on this video and audio? Oh, no, Your Honor. I see exactly what you're saying. No, Your Honor. There's a gap in the video from the standpoint of being able to actually see what's going on. This is not one of those clear things where the video totally undermines the plaintiff's case. Exactly. Well, sometimes we have those, and we say, oh, Scott v. Harris, you lose. This is not that case. Exactly. Okay. Now, what we do have, though, Your Honor, we have, and the court acknowledges this in its memorandum of opinion, we have from about 10 seconds prior to the shots being fired, we have a continuous, you hear the noise continuously of the Taser being deployed, and the court says, well, the jury could determine that maybe that wasn't a Taser, but the uncontroverted evidence from our experts, Your Honor, is that that is the sound of the Taser, and that's the sound that a Taser makes, and it was being fired in that period of time. And that is the evidence, Your Honor, along with the evidence from our defendant that states that's exactly what happened. And if you listen to the very distinct sound of that Taser going off, it goes off up until the shots fired, and then it stops. What did Laureen say about her own accuracy and accuracy? In fact, Your Honor, I have some of those statements written down. She stated, first off, she stated, I'm a forgetful person. That's on page two of the deal. And then she states, he came out swinging. He hit her with a closed fist. He hit her in the head, on top of the head, really hard. She went to the floor. He went toward the officer initially. The officer moved out of the way, and then she hit him. And it's really interesting, she says, in relationship to how Arthur got on the ground, she states she just doesn't remember how Arthur got on the ground. She, excuse me, Your Honor, I'm trying to get this page to open here, there we go, said, Your Honor, she had her head down, and she heard two shots. She had her head down and never saw anything, didn't see any shots occur. She had her head down, and she was focusing downward. Officer tased him, but she didn't see it, she says. She was not listening to that, but Junior told him not to tase him. And then she says, I think, I'm not for sure that it was a taser. What all it was, you know, like somewhere over there by the bathroom door, because I kind of moved out of the way. Then the officer pulled his coat off, and he throwed that on me, and I turned around and put that coat. At that, he got Junior down. I got that coat, and I kind of moved to the side. So she goes on to state, she states then, and she goes on to state again, I did not see anything. I didn't see the deployment of the taser. I didn't see the shots. I heard them. How can her statement, which is internally inconsistent, create a fact issue? Your Honor, I don't believe it can. Everything in that statement is inconsistent. First of all, she says she doesn't remember the stuff that she talks about later on. She states, well, they haven't told me that yet. I'll ask the other side that question then. Yes, Your Honor. So, Your Honor, I think, I think all those points are excellent. And then the, one of the additional things regarding the Texas Rangers, Your Honor, one of the comments that the court makes, first the court says that they essentially have, have, and are, and do side with the defendants in these cases that they're assigned to investigate. And then the court goes on again to say that, for some reason, Ms. McAfee was so enthralled by the Texas Rangers that anything she said would have been the absolute truth. And I find that relatively offensive, to be honest with you, because I don't think that any law enforcement entity or any person is going to be cowed by somebody else, despite their position in life. So, I just find that strange. And her estate still has a claim? Yes, Your Honor. Your Honor, with that said, I believe that in this particular case, the court should reverse and render this case. I believe the court should allow this, this statement, this recorded statement of Ms. Lorraine McAfee into evidence. There's not enough there to create a fact issue. If you look at it, there's just not anything there to even create a fact issue. But it should never come into evidence in the first place because it can never come in at trial. If the court has any questions, I'm happy to respond, Your Honors. All right. Thank you, Mr. Davis. Thank you, Your Honors. I'll let you pronounce your name because I'll probably get it wrong. Thank you, Your Honor. May it please the Court. Matthew Keita. Mr. Keita, all right. I realize that I have one question coming that I already know about, but with the Court's permission, I'd like to address whether or not the appellant has actually met its burden under Rule 56C because if the Court decides either of those in the appellee's favor, it doesn't even need to address the merits of Ms. McAfee's statements. Judge Elrod, you asked about the Court's jurisdiction, and I think that's where the Court should begin, as always. Back in Cole v. Carson, which I know was a very divided opinion on this Court, but the holding ultimately concluded that in an interlocutory appeal on qualified immunity, this Court cannot challenge the District Court's assessment regarding the sufficiency of the evidence. That is, the question is, is there enough evidence for a jury to conclude that certain facts are true? This Court has also said we can look at materiality. We can't look at genuineness, and genuineness essentially means sufficiency of the evidence. So the District Court made a determination that the amount of evidence provided by Ms. Harper would be consistent or be sufficient to allow a rational jury to rule in their favor. But we can rule on whether or not the 807 was correct under our other precedent, right? Now, respectfully, Your Honor, I don't believe that is the case. I thought we have some specific cases that talk about evidentiary rulings can be looked at as part of this process. It's my understanding, Your Honor, that evidentiary rulings can be looked at if it goes to the ultimate issue, which always in a qualified immunity context goes to, was the law clearly established? So if an evidentiary ruling turned on the issue of, you know, is the particular conduct at issue consistent with or inconsistent with decades of case law that is binding, that would be one thing. But I think the Supreme Court has said as far back as, well, I know it's stated in Barron's and I can provide the additional sites. Certainly evidentiary rulings can have a pronounced effect, even if it's just one little ruling. But if that exception were made, the exception would swallow the rule. The only time in an interlocutory appeal in qualified immunity that the collateral order doctrine applies is on the pure question of law, of is the law clearly established. And if you look at the motion for summary judgment in the motion here, in neither of those documents do they suggest that there's a dispute here as to whether or not it's clearly established that you cannot, you know, use deadly force in a situation where a person is not physically threatened. Now the question of whether he was physically threatened is a factual dispute, and the genuineness of that dispute has been ruled on by the district court. But because, and I think this is the policy reason behind it, the district court is not going to let in that statement under 807 at any given time. It might say, yeah, you know what, the only way that you can get any of this in is if the Texas Ranger testifies about it, or if we find that present sense impression or excited utterance from her siblings can somehow backdoor it in that way. You know, but I changed my mind on that. Well, because the district court always retains its ability to change its mind, this court allows it to keep that appeal, and that's why this court should decline to even review the merits of the case for lack of jurisdiction. The other question, the second issue I'd like to address, and it's not detailed specifically in our brief, but as you know, the appellee can't waive error and this court can affirm on any grounds that are supported by the record. The question is whether the appellant met its burden in the first place, and if you look at the motion for summary judgment, the issue that it raised was whether its conduct was objectively reasonable, and his burden under 56C was to show that there is no genuine issue of material and material, excuse me, genuine issue of material fact in dispute, and the evidence that was put forward in the motion for summary judgment was McAndrews' own Now, according to McAndrews, his own assertion of what happened here is that at some point in time, Mr. McAfee, Arthur, got a hold of the taser in both hands, was advancing towards him, and because he feared for his life, he had to use deadly force. He had to use his sidearm to shoot, and I think this is very important because the argument that the appellant has made about why Ms. Lorena's testimony should not be considered is because, well, it's just plainly inconsistent with the video, but respectfully, Mr. McAndrews' testimony is plainly inconsistent with the video, and I made a long list of, probably listened to this 400 times in the last 24 hours, but one thing that you will notice, and you'll notice it first at minute point 2.3, 2 minutes and 35 seconds, and again at 3 minutes and 50 seconds, is the clicking sound, which the other side and their expert has said is the sound of a taser. That's a taser, yeah. There's no dispute about that. One thing you'll find consistent is that that sound lasts for five seconds each time, and it goes from 2.35 to 2.40, and it goes from 3.33 to 3.38, and it goes from 4.50 to 5 o'clock, and at 5 o'clock, uninterrupted, 4 minutes to 5 minutes, and at 4.59 and 5 o'clock is when you hear the two shots. So according to Mr. McAndrews, at some point in time, he fired the taser, Mr. McAfee obtained the taser, turned it on him, and that prompted him five shots, but we know that's not true, because at 4 minutes and 50 seconds, when he begins firing the taser, Mr. McAfee yells out, ah, Jesus Christ, I look out for her, ah, he's the one screaming. There's no pause between the taser being activated, Mr. McAfee screaming, and suddenly two shots being fired. So there's a genuine issue of material fact. But he's been screaming a lot, so how can you say that the screaming is only at the point that he's, I mean, he's screaming, we've watched this a bunch of times, so I mean. He definitely screams a lot, and I will admit, much of what he says is very difficult to discern. However, I think if you had to pick one sentence on the entire five-minute tape that is discernible, it is immediately after the taser starts, and he says, ow, ow, Jesus Christ. I mean, let's put it this way, the U.S. Court doesn't have to conclude that as a matter of law. It could conclude that a reasonable jury could conclude that Mr. McAfee was being shot when he yelled, ow, ow, Jesus Christ, immediately after the taser started firing. And because there's no pause in the taser being fired, before the shots are fired, and because the appellant relies on the Texas Rangers report that Mr. McAfee shot his pistol with his right hand, and that he had his taser in his left hand, it is completely plausible, and these are the genuine issue of material fact and dispute, as to whether he was operating both at the same time. But there's certainly a question. But he could do them both, because you, the guy's not, your client's a deceit, the decedent, I don't mean in disrespect, if he's not succumbing, and he's keep coming, sometimes people don't stop with the taser. We have lots of experience with that. And Your Honor, don't dispute that at all. What I'm saying is, is Mr. McAndrew's sworn testimony is, Mr. McAfee obtained full control of the taser and was coming at me, and that's why I had to be consistent with the video and the sound that we have. There is no pause where Mr. McAfee obtained the taser. And there is a basic credibility issue here, as to whether the story that he's saying is supported by the own evidence that he's offering in terms of the videotape, buttressed by the Rangers report saying he had a gun in one hand and a taser in the other. So, if this Court looks at just the motion for summary judgment, I mean, the appellee, the non-movement, doesn't even need to file a response. If that evidence leaves a question open as to whether his story is true, if we don't know what actually happened, is a better way of putting it, we don't know what actually happened, this Court can't make a ruling as a matter of law as to what was objectively reasonable under the circumstances. And that goes back to this Court's opinion in Darden v. Fort Worth. If we don't know what happened, how can we say that as a matter of law, it's objectively reasonable? That's still a fact to be determined. Now, a jury's gonna get that question. We all know how the Fifth Circuit pattern jury instructions, you know, ask the jury, would an objectively reasonable officer have done this? But they also get to do that by sorting out the disputed facts. And it's our position here that the facts are disputed. Now, with respect to the residual exception, the question that was posed is, or at least answered, was, is there any way that this testimony gets in? And there was some discussion earlier about whether or not the Texas Rangers are aligned with the Harrison County Sheriff's Office. And completely understand, this is not the same situation as, for example, in the insurance case that I provided in my 28-J brief, where they relied on it as part of their investigation. So they said, well, that's some indicia of trustworthiness. But what we do have here is the campaign findings of fact, and even though it wasn't requested or prepared for their benefit, the appellant relies on the statements in the Rangers' report when it benefits them, even though that's hearsay. They rely on the statements from the Rangers' report about where the bullet fragments are going, or sorry, where the bullet wounds entered, or where they're found in the house, or any, but they simply don't want to rely on the hearsay. But what about the report? The report is not a witness statement. One can be hearsay, and one can be part of a records exception for a government report. That doesn't, you break the report into the pieces and do the correct evidentiary analysis. So we have the report, and then we have all of the documents that are attached to it, which include. And you have to prove them up. Correct. And so this one is hard to prove up. I didn't say you couldn't prove it up. I don't know how you prove it up. So maybe you could tell us how you prove it up. As my opposing counsel correctly stated, we're looking at an issue of trustworthiness. There's a reason it's the residual or the catch-all exception here. Now, make a quick distinction. The statements in her affidavit that she made before she passed away and the ones that are made in her sibling's affidavit, there's some suggestion in their reply brief that those were sham affidavits. Nothing in those is even remotely true. And Your Honor asked about Scott v. Harris, which of course is the case where at that time the summary judgment non-movement claimed that he was essentially someone driving to church on Sunday when instead it was a Hollywood-style car chase. It was just blatantly not true. Now, if you look at Ms. McCaffey, Lorraine's testimony, her recorded statement to the officer, the statements in her affidavit, the statements in her sibling's affidavit, much of what she states or allegedly told them is corroborated by the video. There is repeated instances of Mr. McAndrews switching from saying, get on your back, to get on your stomach, to telling him to sit down, to yelling at him about the taser, to how he approached him, the order in which they went into the house. He's trying to get him to get into some still position. Correct, Your Honor. And the question is simply whether Ms. McCaffey can offer testimony to the jury that at the time that the shooting happened, she was at his feet. Okay? Now, will there be some cross-examination available? Should there be some cross-examination opportunities? For you didn't really see the taser, did you? It's going to be cross-examined because it's just whether that comes in. Correct. So, yes, it would have to go to if the brother or the sister were allowed to testify about her statements, which are... Why would they be allowed to testify about her statements? That's a whole other layer of hearsay. Correct. Those would fall within the present sense impression or the excited utterance under their terms. None of those are at an excited utterance. The court didn't even use excited utterance on her recorded statement that same day, so certainly her affidavit's not going to be an excited utterance. Your Honor, in the affidavit, which goes back to the question we talked about earlier about under Rule 56, the testimony doesn't have to be an admissible form. It has to be a... Well, there may be some dispute on this, but assuming that it has to be able to come in an admissible form. And so, how does this come in an admissible form, either these after-the-fact affidavits, which apparently you're relying on, and it wasn't even clear in the briefing that those were being relied on, or this recorded statement? What I'm positing, Your Honor, and even though this is not the subject of the district court's opinion, but falling back on the how could it ever get in, if the brother or the sister were and the response was, my sister called me at X a.m., screaming hysterically that our brother had just been shot, and the following statements of hearsay were offered for the present sex impression or the excited utterance, and what did your sister tell you, and that was allowed in, there is at least the plausibility that that could be... That her statements about what happened, which were also communicated to the Texas Ranger, could be considered on their merits for creating a fact issue that could allow a jury to make a decision. Again, this is a hard case, as you noted, and it's, you know, with a deceased witness, a blurry video, and extraordinarily unfortunate turn of events, you know, the phrase, bad facts make bad laws, on my tip of my tongue throughout, which is why I think that the court's primary focus should be on the jury. What do you do with the internal inconsistencies of the statement, which was the question you knew I was going to ask you, because I asked the other side? I think the internal inconsistencies are reflected not so much by, I think, you know, with respect to her statements to the Texas Ranger. Much of what they are complaining about as inconsistent, I think, can be rectified by the fact that she admits that there are certain things she doesn't know. She doesn't know whether that was the taser or whether it was a pair of gloves. She thought that she was in a certain place when perhaps she was in a different spot. There's a bullet hole in the wall. She claimed he was being shot while he was on his back. She might be wrong, or at least it's a fact question. We don't have the live testimony of that. How can she know whether he was shot while he's on his back if she's not looking and has her head down during that part, and she's just admitted that in the prior sentence? Her statement was that she was holding his legs while the officer was trying to put handcuffs on him while he had his hands above his head. That's her occurrence of what happened. The other side has said we have ballistic analysis that show that there's a bullet fragment in the wall. She's both not looking at the time of the shooting and also simultaneously holding his legs. Correct, Your Honor, but I think that if you were holding someone's legs on the ground, one could make a rational deduction that that person is on the ground as opposed to walking around. Now, again, you can't cross-examine her because she is deceased, but that's the statement that she gave to a Texas Ranger shortly after the incident. There's one other authority that I'd like to point out with respect to the relative indicia of truthfulness or reliability here, and that is that making a false statement to a police officer conducting an official investigation is a crime, and so to the extent that this Court might think that Ms. McCaffey had a preference or it would be likely for her to be telling the truth, she knows the Texas Ranger is doing an official investigation of something that has just happened, so it can at least be not to say a presumption, but a fact going in her favor that it would be unlikely for her to lie. If proven wrong, she could be charged with a beating misdemeanor under Penal Code 3708. Did they give her any of those type of warnings before they interviewed her? I don't believe she was Mirandized, Your Honor, but I don't know. Any warnings that this is an official investigation and what you say here, we're going to record it, and this is, it can be, you know. The elements of the offense are whether or not you did it knowing or intentionally, and I think that's, you would be Mirandized if. Well, you don't need a full Miranda, but that you're, but there's no indicia that she knew that this was some sort of official investigation that she could be in trouble if she didn't tell the truth. Your Honor, I agree with you on the latter half. She was not advised that she could be in trouble if she doesn't tell the truth. I do believe that the transcript of her conversation with the Texas Ranger let her know that he was doing an official investigation. Your Honor, if you have, Your Honors, if you have no additional questions, I'll rest on our briefs and the arguments presented today, and if there's any additional authorities I can provide the Court, I would be happy to do so. Thank you, Mr. Keeter. Mr. Davis or Rebano? Thank you, Your Honor. Your Honor, just a few things that I'd like to respond to. An appeal of a summary judgment presenting evidentiary issues in a qualified immunity appeal raises two levels of inquiry, as I addressed at the beginning of my statements to y'all, and first the Court reviews the District Court's evidentiary rulings for those evidentiary rulings, and then the Court considers the ruling on qualified immunity once a record is determined, what it's going to be, and that is Skotak v. Tenneco Resins, Inc., 953 F. 2nd, 909, 981. Jumpsite 916, 5th Circuit, 1992. Ratliff, which is a 5th Circuit opinion that's not published, oh, yes, it is published, I'm sorry. Ratliff v. Aransas County, 948 F. 3rd, 281, at Jumpsite 286. What do you say about the argument that it's your client who's inconsistent based upon the video and what happened at the five-minute mark? I don't see anything at all inconsistent with anything that happened at the five-minute mark. Well, he just said that your client must have had the taser and the, so therefore, the decedent didn't have the taser. Oh, well, that's totally inconsistent with what our guy says, what he actually testified. It says that the physical, the tape implies, gives some evidence that the decedent was shot with the taser at the 450 to five-minute mark. The decedent did? Did you hear his argument? He went through it by minute by minute? I did, and actually, those minutes by minutes, Your Honor. So, from 10-19-34 through 10-19-44, the taser is going off. You can hear, and that's the point where our client, according to his testimony, which is uncontradicted, is being tased on his and it immediately stops. The taser immediately stops deploying. It shuts off. You don't hear it anymore, but that's the point where his client had the taser and was shocking the officer in this case, and I'd like to point out that, you know, there's some, there's been some comments, at least in the briefing, about this elderly gentleman and our officer. In the record on page 1480, it's from Good Shepherd Medical Center, from this incident, our deputy had an avicular fracture and a wrist tendon injury from this event. So, this is a situation where they were definitely doing enough battle to cause him that type of injury. So, Your Honor, his testimony is consistent, and that's the only testimony about who had the taser, when they had the taser, and why he had to fire his weapon. Thank you, Your Honor. If there's any questions, Your Honor. All right. Thank you, Mr. Davis. Both of today's cases are under submission, and the Court is in recess under the usual order. Thank you.